# EXHIBIT A

September 29, 2023


**KeyBanc**
Capital Markets

127 Public Square
Cleveland, OH 44114

**PRIVATE AND CONFIDENTIAL**

Mr. Cole Johnson
Bridgelink Power, LLC
777 Main Street #3000
Fort Worth, TX 76102

Dear Mr. Johnson:

Reference is made to that letter agreement dated August 24, 2022 (the "Existing Agreement") by and between Bridgelink Engineering, LLC and KeyBanc Capital Markets Inc. ("KBCM"). Bridgelink Engineering, LLC hereby assigns it rights and obligations under the Existing Agreement to Bridgelink Power, LLC, and Bridgelink Power, LLC hereby accepts and assumes all such rights and obligations.

For good and valuable consideration, the sufficiency of which is hereby acknowledged by the Company and KBCM, the Existing Agreement is hereby amended and restated in its entirety. For purposes hereof, all references hereafter to the "letter agreement" shall mean the Existing Agreement as amended and restated herein, and all references hereafter to "Bridgelink" shall mean Bridgelink Power, LLC.

We are pleased to confirm the arrangements under which KBCM, has today been engaged effective May 20, 2019 by Bridgelink Power, LLC (and, together with its subsidiaries, the "Company") to act as sole and exclusive financial advisor to the Board of Directors of the Company(the "Board") in connection with one or more possible Transactions (as defined below). References herein to the Company shall be deemed to include any entity or other structure that the Company may form or utilize to effect any of the transactions contemplated hereby.

For purposes of this letter agreement, the term "Transaction" shall mean, whether effected directly or indirectly or in one of a series of transactions, (a) any merger, consolidation, reorganization, recapitalization or other transaction or series of related transactions pursuant to which all or a material portion of the businesses, assets or other divisions of the Company is acquired by or combined with another person or entity or (b) the acquisition of (i) all or a material portion of the businesses, assets or divisions of the Company or (ii) securities representing 50% or more of the total voting power of the Company in the election of Directors, in any case, whether by way of merger or consolidation, reorganization, recapitalization or restructuring, tender or exchange offer, share exchange, option or negotiated purchase, leveraged buyout, lease or license, investment or partnership, joint venture, spin-off, split-off or otherwise (each of the transactions referenced in clauses (a) and (b) above is hereinafter referred to as a "Sale Transaction); and (II) any sale by Bridgelink, in one or more transactions exempt from registration under the Securities Act of 1933, as amended (the "Securities Act"), of its equity securities, including, without limitation, preferred equity, common equity, options, warrants or rights to acquire equity securities and any other equity or equity-linked securities of Bridgelink or any other securities of Bridgelink that are convertible into or exercisable for its equity securities as described herein (collectively, the "Placement Securities"), which Placement Securities shall represent less than 50% of the total voting power of Bridgelink in the election of members of the Board (a "Private Placement").

Bridgelink Power, LLC
September 29, 2023
Page 2

### I.  Services

#### A.  Sale Transaction Services

During the term of its engagement, KBCM will provide such financial advice and assistance in connection with the Transaction as the Company may reasonably request, including, without limitation, which may include searching for potential counterparties, advising and assisting the Company in evaluating the various structures and forms of any Transaction, assisting the Company in the evaluation of offers and in negotiating the financial aspects of the Transaction.

#### B.  Private Placement Services

During the term of its engagement, KBCM will provide such financial advice and assistance in connection with a Private Placement as the Company or the Board may reasonably request, which may include the following:

(a) To the extent KBCM deems appropriate and feasible, familiarizing itself with the business, properties, and operations of the Company;

    (b) Assisting the Company in the preparation of a confidential private placement memorandum, including any exhibits or amendments thereto, which memorandum shall be drafted by the Company and its counsel, reviewed for accuracy and completeness by the Company and its counsel, and approved in writing, by the Company;

    (c) Identifying and approaching, and soliciting offers from, institutional "accredited investors" (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act) that may have an interest in Placement Securities, with a list of such investors to be approved by the Company;

    (d) Coordinating the due diligence investigation of the Company by interested parties;

    (e) Evaluating proposals from interested parties and assisting the Company in negotiating the terms and sale of the Placement Securities; and

    (f) Assisting Company management in making presentations regarding the sale of Placement Securities to the Board and potential purchasers of the Placement Securities.

It is understood that KBCM shall be obligated to perform the services listed above on a "reasonable efforts" basis and that no obligation on the part of KBCM to purchase any Placement

Bridgelink Power, LLC
September 29, 2023
Page 3

Securities for its own account or for resale to third parties arises by virtue of this letter agreement. KBCM's obligations under this letter agreement are subject to the performance by the Company of its obligations under this letter agreement and, in KBCM's sole determination, the absence of any material adverse change in the financial markets or in the business, operations, financial conditions or prospects of the Company. Furthermore, it is understood that KBCM shall be entitled to rely on the representations and warranties of the Company in any definitive purchase agreement with respect to the Placement Securities, including representations, warranties and opinions contained in documents delivered pursuant to such agreement, and any such agreement shall be in form and substance reasonably satisfactory to KBCM.

## II. Fees

### A. Retainer Fees

As consideration for KBCM's services, the Company agrees to pay KBCM a nonrefundable retainer fee (the "Retainer Fee") in accordance with the following schedule:

   i.   $10,000 upon the onset of investor solicitation; plus

   ii.  $80,000 upon the receipt of any indication of interest; plus

   iii. $210,000 upon execution of a letter of intent.

In the event of that either a Sale Transaction or a Private Placement are consummated hereunder, any such Retainer payments pursuant to clauses (i), (ii) and (iii) above shall be credited in full against the Sale Transaction Fee or the Private Placement Fee to the extent previously paid to KBCM.

### B. Sale Transaction Fee

As consideration for KBCM's services in connection with a Sale Transaction, the Company agrees to pay KBCM a transaction fee (the "Sale Transaction Fee"), in an amount determined in accordance with the following schedule:

   i.   the greater of (i) $3 million, and (ii) 2% of the Transaction Value (as defined below), payable in full upon consummation of a Sale Transaction.

For purposes of this letter agreement, the term "Transaction Value" means (i) the total amount of cash paid, directly or indirectly, for the assets, business, capital stock, options, warrants or other equity securities of the Company (including, without limitation, the total amount of cash deposited in escrow under the terms of any agreement relating to the Sale Transaction); (ii) the fair market value (determined as set forth below) of any assets, securities or other property or rights

Bridgelink Power, LLC
September 29, 2023
Page 4

transferred, directly or indirectly, in payment for the assets, business, capital stock, options, warrants or other equity securities of the Company (including, without limitation, the present value, as of the closing date of the Sale Transaction, of any payments to be made under non-competition, consulting or similar arrangements and any deferred or contingent payments, whether or not such payments are dependent upon future results of operations or other measures of future performance); (iii) the aggregate amount of any dividends or other distributions declared by the Company with respect to its stock after the date hereof, other than normal recurring cash dividends in amounts not materially greater than currently paid; and (iv) the aggregate proceeds received from any sales, transfers or other dispositions of assets of the Company after the date hereof, through a securitization program or otherwise (other than sales of inventory and idle equipment in the ordinary course of business). Transaction Value also shall include, without duplication, any amounts paid to repurchase any securities of the Company (other than repurchases pursuant to and consistent with currently existing stock repurchase programs).

In the event that Transaction Value involved in the Sale Transaction includes deferred or contingent payments (other than amounts withheld or held in escrow), the Company and KBCM shall use their good faith efforts to mutually agree on their present value of such deferred or contingent payments as of the closing of the Sale Transaction; alternatively, if the Company and KBCM do not mutually agree on the present value, KBCM shall receive its Sale Transaction Fee with respect to such deferred or contingent payments as the Company or the former equityholders of the Company receive such deferred or contingent payments. The Company shall, and shall cause its former equityholders to, promptly advise KBCM whenever such deferred or contingent payments are received following the consummation of a Sale Transaction. Any Transaction Value amounts withheld or held in escrow (e.g., indemnification escrow or other similar escrow) shall be deemed paid at closing of the Sale Transaction for purposes of calculating the Sale Transaction Fee.

If, in lieu of receiving all or any portion of the type of consideration payable to the other equityholders (including option holders and warrant holders) of the Company in connection with a Sale Transaction, any equityholder (including option holders and warrant holders) directly or indirectly retains an ownership interest in the Company or directly or indirectly acquires an ownership interest in the corporation or other entity surviving or resulting from the Sale Transaction, the Transaction Value shall be calculated by assuming that such equityholder (including option holders and warrant holders) had sold its entire ownership interest in the Company and received in exchange therefor an amount per share equal to that received by the Company or the other equityholders (including option holders and warrant holders) of the Company, as the case may be, in the Sale Transaction. Similarly, if the Company retains ownership of any of its assets or businesses, the Transaction Value shall be increased by such amount as may be appropriate to reflect the value of such retained assets or businesses.

For purposes of calculating the Sale Transaction Fee, the fair market value of securities for which there is an established trading market will be the closing sale price of the securities on the

Bridgelink Power, LLC
September 29, 2023
Page 5

trading day preceding the date of the closing of the Sale Transaction (as reported on Bloomberg). The fair market value of any assets, securities (other than as provided above), property or rights (including deferred or contingent payments) will be mutually agreed by KBCM and the Company. If the parties cannot agree upon the fair market value of such assets, securities, property or rights (including deferred or contingent payments), they will choose a qualified appraiser of national standing, at the Company's expense, to conclusively determine such fair market value. Upon request, the Company will make available to KBCM any information available to it for purposes of calculating the amount of any component of the Transaction Value. If any amounts payable in a Transaction are computed in any currency other than U.S. dollars, the value of such currency for purposes hereof shall be converted into U.S. dollars at the prevailing exchange rate on the date on which such amounts are paid.

### C. Placement Fee

As consideration for KBCM's services hereunder in connection with a Private Placement, the Company agrees to pay to KBCM, payable in full promptly upon the execution hereof and a placement fee in an amount equal to the greater of (i) two percent (2.0%) of the aggregate purchase price paid by investors for any Placement Securities sold during the term of this agreement and (ii) $3,000,000 (the "Placement Fee"), payable in full promptly upon consummation of a Private Placement.

### III. Expenses

In addition to any fees that may be paid to KBCM hereunder, whether or not any Transaction occurs, the Company agrees to reimburse KBCM periodically, upon receipt of an invoice therefor, and upon consummation of the Transaction or transactions contemplated hereby, for all reasonable out-of-pocket expenses incurred in connection with the performance of its services under this letter agreement, including but not limited to, transportation, lodging, meals, document services, courier charges, database services, word processing production and reasonable fees and expenses of third parties retained by it, such as legal counsel.

### IV. Miscellaneous

If (i) the Sale Transaction Fee is not paid in full within 10 business days following consummation of any Transaction; or (ii) the Placement Fee is not paid in full within 10 business days following consummation of any Private Placement; or (iii) the Retainer is not paid in full within 10 business days, then the Company agrees that it will be responsible for all fees and expenses incurred by KBCM (including reasonable fees and disbursements of KBCM's legal counsel) in connection with any action, suit or proceeding instituted in order to enforce the Company's obligation to pay KBCM the Retainers, the Sale Transaction Fee, the Placement Fee, and/or to reimburse KBCM for expenses as provided by this letter agreement.

Bridgelink Power, LLC
September 29, 2023
Page 6

      This letter agreement may be terminated with or without cause by KBCM or the Company at any time upon 30-days' written notice to the other party to that effect. Upon termination of this letter agreement, neither party will have any liability or continuing obligation to the other, except that: (i) the provisions of Appendix A and Appendix B to this letter agreement will survive any such termination; (ii) the Company will remain liable for KBCM's reasonable out-of-pocket expenses incurred and fees earned up to the time of termination; and (iii) if a Transaction is consummated within 12 months of the termination of KBCM's engagement (the "Tail Period") or if a definitive agreement or letter of intent or other evidence of commitment with respect to such a Transaction which is subsequently consummated is entered into during the Tail Period, or if the Company receives Compensation with respect to any such Transaction that is not consummated, the Company will pay KBCM the Sale Transaction Fee or the Placement Fee, as the case may be, in accordance with the terms of this letter agreement.

      KBCM and the Company agree that the provisions set forth in Appendix A and Appendix B attached to this letter agreement form an integral part of this letter agreement and are hereby incorporated by reference in their entirety. Capitalized terms used but not defined in any of the Appendices hereto shall have the meanings assigned to them in this letter agreement. All references in the Appendices hereto to the "letter agreement" shall mean this letter agreement.

*Remainder of Page Intentionally Blank. Signature Page Follows.*

Bridgelink Power, LLC
September 29, 2023
Page 7

If this letter agreement accurately sets forth the understanding between us, please sign the enclosed copy of this letter agreement below and return it to KBCM, at which time this letter agreement will become a mutually binding obligation.

Very truly yours,

KEYBANC CAPITAL MARKETS INC.

By: *Edward C. Hertz*
Name:  Edward Hertz
Its:  Managing Director

By: *[signature]*
Name:  Steven Danford
Its:  Director

Agreed to as of the above date:

Bridgelink Power, LLC

By: *[signature]*

Name: Cole W. Johnson
Its: President and CEO

Taxpayer Identification Number: ███

Assignment and Assumption agreed to as of the above date:

Bridgelink Engineering, LLC

By: *[signature]*
Name: Cole W. Johnson
Its: Vice President and Secretary

Taxpayer Identification Number: ███

## APPENDIX A

### Standard Terms and Conditions

1.	The Company will provide KBCM (and will request that each prospective purchaser with which the Company enters into negotiations provide KBCM) with such information as KBCM reasonably deems appropriate in connection with its engagement and will provide KBCM with timely access to the Company's officers, directors and advisors. All such information concerning the Company will be true and accurate in all material respects and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which such statements are made. The Company acknowledges that KBCM: (i) will be using and relying upon the accuracy and completeness of the publicly available information or information supplied by or on behalf of the Company and any other party to a Transaction in connection with its engagement without independent verification; (ii) does not assume responsibility for the accuracy of any such information; (iii) will not make an appraisal of any assets or liabilities of the Company or any prospective purchaser; and (iv) in relying on any financial forecasts that may be furnished to or discussed with KBCM, will assume that such forecasts have been reasonably prepared on bases reflecting the best currently available estimates and good faith judgments of management as to the future financial performance of the Company or other party to a Transaction, as the case may be.

2.	(a)	It is understood that in connection with any Private Placement, the offer and sale of the Placement Securities will be exempt from registration requirements of the Securities Act, pursuant to Section 4(2) thereof. The Company will not, directly or indirectly, make any offer or sale of Placement Securities or of securities of the same or a similar class as the Placement Securities if, as a result, the offer and sale of Placement Securities contemplated hereby would fail to be entitled to the exemption from the registration requirements of the Securities Act provided for in such Section 4(2). As used herein, the terms "offer" and "sale" have the meanings specified in Section 2(3) of the Act.

(b) In connection with all offers and sales of the Placement Securities, the Company will:

(i)	not offer or sell the Placement Securities by means of any form of general solicitation or general advertising. The Company will not at any time during the term of this engagement, or for a period of six months following completion of the placement of Placement Securities contemplated hereby, make any reference publicly to the transactions contemplated hereby, by way of the issuance of a press release, the placement of an advertisement or otherwise, without the prior written consent of KBCM;

(ii)	not offer or sell Placement Securities or solicit offers to buy Placement Securities in any manner that would require registration of the Placement Securities under the Securities Act; and

(iii)	exercise reasonable care to ensure that the purchasers of the Placement Securities are not underwriters within the meaning of Section 2(11) of the Act.

3.      All opinions and advice (written or oral) given by KBCM to the Board in connection with KBCM's engagement under the letter agreement are intended solely for the benefit and use of the members of the Board (solely in their capacity as directors and not in their personal capacities) and shall be treated as confidential by the Company and the Board, and the parties agree that no such opinion or advice shall be used, reproduced, disseminated, quoted or referred to at any time, in any manner or for any purpose, by the Company or the Board without KBCM's written consent, except as expressly contemplated by the letter agreement or as may otherwise be required by applicable law (after consultation with, and approval as to form and substance by KBCM).

4.      The Company acknowledges that KBCM (collectively with its affiliates, the "KeyCorp Group") is a full service securities firm and as such is engaged in a wide range of investment banking and other activities. Members of the KeyCorp Group may from time to time effect transactions for their own accounts or the accounts of customers, and hold positions in securities or options on securities of companies which may be the subject of the engagement contemplated by the letter agreement. Members of the KeyCorp Group also may from time to time perform various investment banking, commercial banking and financial advisory services for other clients and customers who may have conflicting interests with respect to the Company or the Transaction. Information that is held elsewhere within the KeyCorp Group will not for any purpose be taken into account in determining KBCM's responsibilities to the Company under the letter agreement. Neither KBCM nor any other part of the KeyCorp Group will have any duty to disclose to the Company or utilize for the Company's benefit any non-public information acquired in the course of providing services to any other person, engaging in any transaction (for its own account or otherwise) or otherwise carrying on its business. Further, the Company acknowledges that from time to time KBCM's research department may publish research reports or other materials, the substance and/or timing of which may conflict with the views or advice of the members of KBCM's investment banking department. KBCM's investment banking department is managed separately from its research department and does not have the ability to prevent such conflicts.

5.      The Company acknowledges KBCM or its affiliates may have fiduciary or other relationships whereby KBCM or its affiliates may exercise voting power over securities of various persons, which securities may from time to time include securities of the Company or of potential purchasers or others with interests in respect of the Transaction. The Company acknowledges that KBCM or such affiliates may exercise such powers and otherwise perform its functions in connection with such fiduciary or other relationships without regard to KBCM's relationship to the Company hereunder.

6.      The Company acknowledges that KBCM is not an advisor as to legal, tax, accounting or regulatory matters in any jurisdiction. The Company agrees that it will consult with its own advisors concerning such matters and be responsible for making its own independent investigation and appraisal of any Transaction, and that KBCM has no responsibility or liability to the Company with respect to such matters.

7.      The Company represents that it is a sophisticated business enterprise that has retained KBCM for the limited purposes set forth in the letter agreement, and the parties acknowledge and agree that their respective rights and obligations are contractual in nature. The

Company disclaims any intention to impose fiduciary obligations on KBCM by virtue of the engagement contemplated by the letter agreement. In addition, the Company acknowledges and agrees that KBCM has been retained under the letter agreement to act as an advisor solely to the Company and not as an advisor to any other person, and that no other person, including any employee, equityholder or creditor of the Company, shall be a beneficiary or acquire or have any right under or by virtue of the letter agreement as against KBCM or its affiliates, or their respective directors, officers, employees or agents, successors or assigns. The letter agreement may not be assigned by either party hereto without the other party's prior written consent. The Company acknowledges and agrees that (i) KBCM will act as an independent contractor and is being retained solely to assist the Company in connection with its consideration of a Transaction and that KBCM is not being retained to advise the Company on, or to express any opinion as to, the wisdom, desirability or prudence of consummating the Transaction and (ii) any advice rendered by KBCM does not constitute a recommendation to any equityholder that such equityholder might or should take in connection with the Transaction. Any new or expanded engagement beyond that described above will require KBCM's agreement and may require the parties to enter into additional documentation to reflect such new or expanded engagement.

8. No fee payable to any other financial advisor by the Company or any other company in connection with the subject matter of this engagement shall reduce or otherwise affect any fee payable to KBCM under the letter agreement.

9. **EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION, CLAIM OR PROCEEDING (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATING TO OR ARISING OUT OF THE LETTER AGREEMENT, THE ENGAGEMENT OF KBCM PURSUANT TO THE LETTER AGREEMENT OR THE PERFORMANCE BY KBCM OF THE SERVICES CONTEMPLATED BY THE LETTER AGREEMENT.**

10. Following the closing of a Transaction, KBCM may, at its option and expense, place customary tombstone announcements and advertisements or otherwise publicize the Transaction and KBCM's role in it (which may include the reproduction of the Company's logo).

11. KBCM undertakes to use all non-public information ("Confidential Information") concerning the Company solely for purposes of the performance of its services hereunder and to keep it confidential unless and until such information becomes public, except that KBCM may disclose Confidential Information in order to perform its services under this engagement, including disclosing such information to its affiliates, officers, employees, agents, advisors and other representatives who need to know such information in connection with KBCM's engagement hereunder. Notwithstanding anything to the contrary set forth herein, KBCM shall not be obligated to treat confidentially any information that (a) is or becomes publicly available other than by disclosure by KBCM in violation of the terms hereof, (b) otherwise is required by applicable law, rule or regulation, or as requested by any self-regulatory organization, governmental agency, or judicial or regulatory process (including those of any stock exchange) to be disclosed, or (c) KBCM becomes legally compelled (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigation demand or similar process) to disclose. Further, KBCM shall be entitled to retain Confidential Information solely for archival purposes as required by

applicable law, rule or regulation or by any self-regulatory organization, governmental agency, or judicial, compliance or regulatory process.

12.     The letter agreement may not be amended or modified except in writing and shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of laws.

13.     Except as set forth below, the parties agree that any dispute, claim or controversy directly or indirectly relating to or arising out of this agreement, the termination or validity of this agreement, any alleged breach of this agreement, the engagement contemplated by this Agreement or the determination of the scope of applicability of this agreement to this Section 13 (any of the foregoing, a "Claim") shall be commenced in the Commercial Division of the Supreme Court of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York, which courts shall have exclusive jurisdiction over the adjudication of such matters and shall decide the merits of each claim on the basis of the internal laws of the State of New York without regard to principles of conflicts of law.  The Company and KBCM agree and consent to personal jurisdiction, service of process and venue of such courts, and agree not to assert the defense of forum *non conveniens*.  The Company and KBCM also agree that service of process may be effected through next-day delivery using a nationally-recognized overnight courier or personally delivered.  The Company also hereby consents to personal jurisdiction, service and venue in any court in which any action is brought by any third party against KBCM or any party entitled to indemnification hereunder.

14.     If any term, provision, covenant or restriction contained in the letter agreement, including this Appendix A and Appendix B attached hereto, is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in the letter agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

## APPENDIX B

### Indemnification Provisions

In the event that KeyBanc Capital Markets Inc. ("KBCM") becomes involved in any capacity in any action, proceeding or investigation brought by or against any person, including equity holders of the Company, in connection with any matter related to the engagement described in the letter agreement, the Company will reimburse KBCM for its legal and other expenses (including the cost of any investigation and preparation) reasonably incurred in connection therewith as such expenses are incurred; provided, however, that if it is finally judicially determined by a court of competent jurisdiction in any such action, proceeding or investigation that any losses, claims, damages or liabilities of KBCM have resulted solely from the gross negligence or willful misconduct of KBCM in performing the services which are the subject of the letter agreement, KBCM shall repay such portion of the reimbursed amounts that is attributable to expenses incurred in relation to the act or omission of KBCM which is the subject of such finding. The Company shall indemnify and hold KBCM harmless against any losses, claims, damages or liabilities to KBCM in connection with any matter related to the engagement described in the letter agreement, except to the extent that any such losses, claims, damages or liabilities are finally judicially determined by a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of KBCM in performing the services that are the subject of the letter agreement.

If for any reason the foregoing indemnification is unavailable to KBCM or is insufficient to hold it harmless, then the Company shall contribute to the amount paid or payable by KBCM as a result of such losses, claims, damages or liabilities in such proportion as is appropriate (i) to reflect the relative benefits to the Company and its security holders on the one hand, and KBCM on the other hand, in connection with the transaction to which such exculpation, indemnification or reimbursement relates or (ii) if the allocation on that basis is not permitted by applicable law, to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of KBCM and the Company as well as any other relevant equitable considerations. The Company and KBCM agree that it would not be just and equitable if the contribution provided for herein were determined by pro rata allocation or any other method which does not take into account the equitable considerations referred to above. For purposes of this Appendix B, it is hereby further agreed that (i) the relative benefits to the Company, on the one hand, and KBCM, on the other hand, with respect to this engagement shall be deemed to be in the same proportion as (x) the total value paid or received or contemplated to be paid or received by the Company and its security holders in the Transaction (before deducting expenses) bears to (y) the fees actually paid to KBCM in connection with this engagement and (ii) the relative fault of the Company, on the one hand, and KBCM, on the other hand, with respect to the Transaction shall be determined by reference to, among other things, whether any untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company, any of its affiliates and/or any of its or their respective officers, directors, agents, employees or controlling persons or by KBCM, as well as the Company's and KBCM's relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. In no event shall KBCM contribute any amounts in excess of the fees actually received by it pursuant to the terms of the letter agreement.

The Company shall be liable for any settlement of any claim against KBCM made with the Company's written consent, which consent shall not unreasonably be withheld, and the Company shall not, without the prior written consent of KBCM, settle or compromise any claim or permit a default or consent to the entry of any judgment in respect thereof, unless such settlement, compromise or consent (i) includes, as an unconditional term thereof, the giving by the claimant to KBCM of an unconditional release from any and all liability in respect of such claim and (ii) does not include any statement as to, or any admission of fault, culpability or a failure to act on the part of KBCM. KBCM shall have the right to retain counsel of its own choice to represent it in connection with any matter as to which the indemnity, expense reimbursement and contribution provisions apply. The reimbursement, indemnity and contribution obligations of the Company under this Appendix B shall be in addition to any liability which the Company may otherwise have (at common law or otherwise), shall extend upon the same terms and conditions to any affiliate of KBCM and the officers, directors, agents, employees and controlling persons (if any), as the case may be, of KBCM and any such affiliate, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company, KBCM, any such affiliate and any such person. The indemnity obligations of the Company hereunder shall not extend to any affiliate of KBCM or to the officers, directors, agents, employees, or controlling persons (if any), as the case may be, of KBCM or any such affiliate to the extent that any losses, claims, damages or liabilities is finally judicially determined by a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of KBCM or any such other person in performing the services which are the subject of the letter agreement. The Company also agrees that neither KBCM nor any of such affiliates, officers, directors, agents, employees or controlling persons shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or its equity holders for or in connection with any matter referred to in the letter agreement, except to the extent that any losses, claims, damages or liabilities incurred by the Company are finally judicially determined by a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of KBCM in performing the services that are the subject of the letter agreement. Moreover, in no event, regardless of the legal theory advanced, shall KBCM, any affiliate of KBCM or the officers, directors, agents, employees and controlling persons (if any), as the case may be, of KBCM and any such affiliate be liable to the Company or any of its equity holders for any consequential, indirect, incidental or special damages of any nature. The provisions of this Appendix B shall survive any termination or completion of the engagement provided by the letter agreement and shall be in addition to any rights that any indemnified party hereunder may have at common law or otherwise.